I may have pleased the court. Good morning. As the court knows, I think cases against the government are the most important. We have recognized that one recurring challenge in these cases is the court stating what the law is, separate, apart from what the government saying what the law is. But fortunately, the district court chief judge in this case didn't have that issue. If I point the court's attention to the district court opinion on the subject summary judgment, App. 11, where he references his long exposition on what the law is, Appendix 47-59. Thus, I split my analysis into two parts, what the law is in the context of what the district court judge said the law is, and did the university violate the law. At App. 47-48, the judge discusses that neither the Supreme Court nor the Eighth Circuit has ever applied a stringent facial standard of judicial oversight to the discretionary decisions of school officials administering a non-public educational forum. However, in those pages, the judge then explains why that should be the case, that such a framework is applied, starting with the U.S. Supreme Court decision in Southworth. The three principles of Southworth the chief judge describes are that government-sponsored private speech is not government speech. Therefore, it is subject to the First Amendment. The second principle the judge identified was government-sponsored private speech is a limited public forum. And the third principle the chief judge noted was that Southworth indicated to the U.S. Supreme Court that certain safeguards should be applied to limited public forums in order to ensure viewpoint neutrality. In the Southworth case, according to the chief judge, the framework was not applied because parties had stipulated as to viewpoint neutrality. In this case, of course, we have not. At Appendix 24-26, the judge discusses viewpoint neutrality. Counsel, have the appellants suffered an injury? Their First Amendment rights were violated with respect to... How so? Did they request, did they submit an application for space that was turned down? That's indicated in the brief that it would have been futile because the policy did not allow any of these spaces to be available even if a group applied. And so viewpoint neutrality now is a recognized student organization and under the current policy, no space is ever available even if you apply. So the answer is no. They didn't submit an application or a request that was denied. The answer to the question is no because it would be futile, which is a standard recognized further. With respect to a previous litigation, we tried a group called Collegians for a Constructive Tomorrow, have attempted those approaches and there are two decisions in the Court of Appeals just basically incorporating this. So there are multiple efforts, the previous litigation, the Curry case, two cases brought in the Minnesota Court of Appeals to address this inequity and here we are. This is like a fourth effort. So going... But does the appellant, are you making reference to an occasion in which space was opened up and applications were received and decisions were made with respect to I think the nine, I think it was nine slots or spaces? Yeah. My understanding that this decision really was made to allow these student cultural centers to have space, that that decision was really made a long time ago and it's not been revisited. Well, yeah, it was decades ago, but most recently it was revisited like 12 years ago. That's my opened up an opportunity for others, other groups to submit requests and applications and new decisions were made or was it simply these are the, these were the allocations of space that were made 20 or so years ago and they've just been maintained all this time and there's not been, it's not been thrown open, so to speak, for new applications during that time. That's correct. 68% of the space was assigned to these nine same groups and the other groups like CFACT wanted to have space, but they were denied space and there was no criteria other than these groups were there previously and so they assigned the 68% and these groups have political and ideological agendas. It was very difficult because of the way the website presents the groups as cultural centers. Let me ask you a question about that, Council. I think everyone agrees this is a limited public forum and the university is permitted to engage in content-based discrimination to preserve the purpose of a limited public forum, but they can't engage in viewpoint discrimination. So the first thing we have to do is determine what was the purpose of the limited public forum. What does the summary judgment record show was the university's purpose for creating the limited public forum? The university refers in their brief to these groups as cultural groups and their space as cultural centers. Is that borne out by the record or what was the purpose? And the reason I'm asking the question is that the next step then is to determine whether the university adhered to that purpose or not. Yeah, like I was mentioning the evidence is replete that the government speech describes these as cultural centers but then we had to burrow down and find out that the leases identify these groups as student organizations. So these are student organizations. That's why it's a limited public forum. So these are students speaking. This isn't the government speaking. The US Supreme Court in Rosenberger said that if you have limited space to allocate to students, in that case it was meeting rooms, that you have to apply a neutral principle. What does the record show was the neutral principle or principle that the university applied in identifying these nine groups? So what was the purpose of the public forum and what principle did they apply to identify the group that they were going to allocate space to? The principle in 2011 was that these groups were here before and then the government speech describes them as student cultural centers. When you burrow down and see in the leases they're student organizations and if you burrow down these student organizations receive university student fees. They get the lounges at the Commonwealth Union rent free. So it's the purpose that has been stated in the briefs is that these are minoritized groups or identities. I don't see how the Jewish group, which applies, or the Christian group that applies, or the conservative group that applies, that they don't have sort of the same type of cultural identities. I mean it's egregious viewpoint discrimination to have a queer cultural center for decades and not offer a contrasting view. This is private speech. So the biggest distinction is between government speech and private speech. So when the government speaks the First Amendment doesn't apply. But when the government creates a limited public forum for private groups to speak then the First Amendment viewpoint neutrality principles apply to the limited public forum. What though is the evidence that the groups were picked based on their viewpoints? I thought I said the principle was they were incorporated the groups. The consequence of these decisions is you have four or five of the groups are obviously ideologically from the left. And my clients would like to have a little bit of change. They want to see the space used by different groups. They have different cultural identities, different ideological identities, different, different. So how can the university have a limited public forum and say these five student groups, or nine student groups, reflect the culture and perspective of the university? Now the university could do it. The university can say whatever it wants. That's First Amendment, that's not First Amendment speech. But when there's a limited public forum and the university sponsors private groups, then it has to be viewpoint neutral. Otherwise there are problems. The government here is indirectly communicating a message by its sponsorship of the private groups. And that's subject to First Amendment viewpoint neutrality principles. Counsel is the, is viewpoint neutrality now arguing on appeal that the university's policy is unreasonable. That's one of the tests. And have you developed that in your brief? Yes. It's unreasonable to have an application process where the groups never, ever have space available to receive. The nine groups have occupied these places for, since well beyond 2011, but the new policy was 2011. And the groups never get a chance. It's unreasonable for like a traditional, say, conservative group, like Voices for Conservatism, to have their application denied every year and not have a chance to replace the Queer Cultural Center, for example. The Women's Activist Collective, the Muslim group, you could juxtapose that to the Jewish student application. So the Jewish students group, they apply, no space, but the Muslim group gets to stay every year. So that's unreasonable not to allow other groups to cycle through. Let me ask you about one of the groups. It's my understanding that one of the original nine groups was a young women's group and that at some point that changed to the Feminist Student Activist Collective. Does that impact our analysis and how? Yes, it shows again that the university is indirectly sponsoring speech and that by not having an open process for other student groups with other ideologies, other perspectives to apply, the university is sponsoring this certain speech, this certain perspective, and the university is limited in that way. We need safeguards and that's what South Africa is doing. Very well. Thank you, Mr. Cardell. Good morning, Your Honors, and may it please the Court. My name is Kari Ryan-Galley. I'm an attorney at the University of Minnesota here today on behalf of the Board of Regents, the individual members of the Board of Regents, Interim President Ettinger, and Vice President Phillips, all of whom respectfully ask this Court to affirm the decision of the District Court. The issue before this Court today is narrow. Viewpoint neutrality now asks the Court to find that the university discriminated on the basis of viewpoint in violation of the First Amendment when it decided a decade ago to allocate space in the student union to nine cultural centers. But viewpoint neutrality now can point to no evidence of viewpoint discrimination in the record. Instead, it appears to argue that the university's decision to create a limited public forum for identity-based cultural centers was itself viewpoint discrimination. But this argument is premised on the very kind of illegitimate stereotyping, equating identity with viewpoint, that the Supreme Court has repeatedly found unconstitutional. As the Court put it in Grutter v. Bollinger, it is not permissible to assume that, quote, minority students always or even consistently express some characteristic minority viewpoint. Here the provision of space to the cultural centers in the union does not violate the First Amendment. The university created a limited public forum on the second floor for cultural centers not because of the viewpoint of the cultural centers, which are open to all university students and necessarily represent a wide range of viewpoints. Counselor, are you, is it your position then that the purpose of the limited public forum was for cultural centers? Yes, for the 68 percent that is set aside for cultural centers, that was the purpose was to provide space for cultural centers. And under Rosenberger, what was the neutral principle that was applied to allocate the limited meeting space? The neutral principle was, is documented in the record through the process that the Board of Governors undertook in the early 2010s. Is it because they were cultural groups? Is that basically the... Yes, because they represented various identities on campus. Identities or cultures? Identities and cultures, I think that those are different ways of saying the same things. So are you equating ideology with culture? No. We can't equate ideology with culture. Right, so let me ask you about one group, the Feminist Student Activist Collective. What makes someone a feminist? The record does not address what makes somebody a feminist. The record does show that that group changed over time. That that group originally was the Young Women's Christian Association with the first group to get space in the union. Over time, as students changed, issues changed, that group changed its name over time. And the record shows that it changed from the Feminist Student Activist Collective in an effort to be more inclusive and to be open to more people who were interested in... Does that indicate that there was a change in content-based discrimination, which is permissible for cultural groups, to viewpoint discrimination, which is impermissible when they allowed the group to change from a cultural group to an ideologically-based group? The, if you... Would you agree that feminism is a, ism is an ideology? No, I wouldn't, Your Honor. I think feminism encompasses... You think that that's a cultural group? I think if you look at the record, which shows the renewal documents for that particular group, I can find the exhibit number if you would appreciate that, but it shows the renewal documents for the group show the purpose of the group, the constitution of the group, and the membership for the group. And none of those show that the group is devoted to a particular ideology or particular issues, that instead the group is open to all. Does feminism itself on its face indicate an ideology? Is it an ism? Your Honor, I... The reason I'm asking these questions is that the university may, under Supreme Court precedent, engage in content-based discrimination. It may not engage in viewpoint discrimination. So if they formed the limited public forum for the purpose of cultural groups, and then they allowed it to be changed for ideological groups, that's a problem. I think that would be a problem if the record showed that the constitution and the purpose of that group had changed, and had sort of abandoned a cultural identity, and instead was specifically devoted to a particular ideology. But the renewal documents in the record, where the Feminist Student Activist Collective describes its membership and its purpose, do not reflect a shift to ideology. But if the university is redefining terms of ideologically-based groups to be cultural groups in order to fit the purpose of the limited public forum, then they're not necessarily adhering to the original purpose of the forum. I think that would be true if the university were redefining the terms, but I think it's important to look at the record and how the group defines itself. Well, I'm not saying this particular group. I'm saying groups in general. If you're defining an ideology as a culture, and saying that the purpose of the limited public forum is culture, then you're necessarily going beyond content-based discrimination. Your Honor, I think that could be possible, but that's not the record in this case. The record in this case shows nine groups that were chosen without regard for any particular viewpoint or ideology, and groups that engage in a wide range of expressive activity, some of which is highly critical of the university, which would belie any assumption that the university selected those groups for alignment with particular ideologies. If the record showed that the university chose a group specifically because it agreed with its viewpoint, I think we would have a First Amendment issue here, but that is not what the record in this case shows. So what was the neutral principle under Rosenberger on which these nine groups were selected? They were selected because the forum was defined for identity-based cultural centers, and then the decisions made as to who had access to that forum, as the record shows, were both viewpoint-neutral and reasonable. How do we distinguish between content and viewpoint? Content is what is used here to define the limited public forum. It is permissible the government is a property owner like any private citizen, and it can retain its property for its own uses. If it chooses to open up that property for the expressive activity of others, it can define the purpose for that expressive activity. So here what it did with this particular portion of the union was define a space for expressive activity by cultural centers. That is a content-based distinction. Viewpoint comes in where the university preferences a particular group because it agrees with the positions it takes, the opinions that it has, the messages that it sends, or it discriminates against a group because it disagrees with those. There is no evidence in this record that any of the nine cultural centers that have space in the union were chosen because of university agreement with positions, messages, or opinions that those groups take, or that any other groups were denied space because the university had a problem with their messages or opinions. So we look at content when we're looking at the definition of the forum, and we look at invited in to take advantage of that space for expressive activity. As Judge Grass mentioned, there is content-based discrimination here in the decision to create a forum for cultural centers. The same thing happened on that same floor in the building. The university created a forum for registered student governance associations. Viewpoint neutrality now does not challenge that determination, so it tacitly agrees that it is permissible for the university to decide to treat certain registered student organizations differently and to allocate space to them. That's what it did with the registered student governance associations and also with commuter students. They are given space on the floor as well. The challenge here only centers around the decision to create the forum for the cultural centers. I wanted to ask you about the university's argument that this is an old decision that is not ongoing. It's my understanding that space, even though the same groups are reallocated, the space is allocated annually, but more importantly, perhaps, it's subsidized with an annual, or actually semester-by-semester student fee. So if it's allocated annually and it's subsidized with a student fee that's collected each semester, why is that not an ongoing decision or an ongoing policy? Your Honor, I think the way I can best understand it is more as a semi-permanent decision. A decision was made when the union was renovated in the early 2010s. One of the factors in that decision was to address the problem that had plagued the union since it opened in 1940, which is that demand at the university far outstrips supply for space on campus. There are over 800 student organizations at the University of Minnesota. There's student turnover every year or every semester, and from a student's perspective, they're being assessed fees every semester on an ongoing, renewed basis. Why does that make it an old allocation rather than an ongoing allocation? So the allocation decision was made in the early 2010s to give space to these nine cultural centers. One of the charges to the Board of Governors was to come up with a solution to reduce the administrative burden of reallocating space annually. So the decision was made to give the space to these nine. It is not a permanent decision in that it is revisited annually through the renewal process, and there is accountability on the part of those groups. The renewal process specifically looks at foot traffic in the spaces, events, how many events are offered, how attended are those events. So there is an effort made to make sure that the nine cultural centers that have the space are continuing to serve the campus community in a robust way, offering fee-funded, as you acknowledge. The union itself is subsidized by a student services fee. Some of these groups receive an annual allocation of a student services fee through an application process. So to make sure, because of the responsibility of fee-funded services, that they are continuing to robustly serve the campus community. We see from the record that certain groups have been put on a yellow status over time, which shows that there is concern that they are not robustly serving a wide range of students. And then we have seen over time that those groups have re-upped the amount of engagement and gotten back to green status. So it is a decision made to reduce the administrative burden. That's a reasonable decision the university made, given how burdensome it had been for the prior 70 years of administering that space. But also there is accountability built in that a group hasn't gone dormant, that the space isn't going unused, that the nine groups that are in there continue to serve the campus in a robust way. And that is checked in on annually. So it sort of perpetuates the reasonableness of the decision that was made in the early 2010s to give the space to those groups. Well, is there an occasion in the record, reflected in the record, over the period of time that these groups have been able to use this space that, for example, let's take the Muslim Cultural Center, for example, was there an occasion in which the Muslim group was rejected or a Jewish group that applied was rejected? In other words, I've tried to get at is there an instance in the record in which these appellants applied and they were rejected and an opposing viewpoint was chosen to continue? There certainly is not an instance in the record that these appellants applied. At the time of the complaint, these appellants were not a registered student organization. So they were not in a position to apply because the space is set aside for registered student organizations. There is no example of an opportunity where the Muslim student organization, for example, was up for renewal and a different religious organization applied and was denied. That's not what the record shows. The record shows a broad consultative process looking at how to use that space. There's no evidence that the university chose to give space to the Almudena Cultural Center because it preferred a particular religion over another one or that it preferred disabled students over non-disabled students in providing space to the Disabled Student Cultural Center. The record does not show an example where the appellants were denied space in this area. Counsel, I believe the record does show that you have only nine groups from a very large public university, but two of them claim to represent transgender students. Is that reasonable? Only nine groups when so many groups are left out? I'm sorry, could you rephrase your question for me? Two groups, I believe the record shows, claim to represent transgender students as part of their purpose. I believe that among the identities of two of the groups, the record does show that two of them encompass transgender students and their identities, yes. So my question is, is that reasonable given the very limited amount of space? I think we have to, again, look at the ample alternatives for expressive activity on the campus. Like you admitted, it is a large campus. There's additional space on the second floor of the union that is reservable. In the record, there is a letter from the Director of Student Unions and Activities that sort of outlines what the alternatives are. There's reservable space across campus that's available to everybody. And the majority of student groups operate without office space altogether. So there's no sort of requirement for that as well. So I think there's nothing unreasonable, and the First Amendment does not require every identity to be represented in a limited space. There will be decisions made because of, again, the demand outstripping supply. The obligation of the university, and one that it takes dearly, is to do so in a viewpoint-neutral way that is reasonable. So Your Honors, unless there are further questions, the appellees in this case respectfully ask the Court to affirm the District Court's decision in all regards. Thank you very much. Thank you, Ms. Galloway. Thank you, Your Honor. With respect to standing, I just wanted to mention, of course, we pay the university student fees, which are used in part to pay for the Kauffman Memorial Union and the student organizations and the space that we're talking about. Mr. Cardell, you were able to conduct discovery in this case, right? Yes. Did you develop any evidence, other than your sort of speculation based on the names of these groups, that the university picked these groups based on their viewpoints or that they liked what these particular groups were saying versus other groups? Did you develop any evidence like that? Yes, based on the statements of the private groups. Also, there's the speech of the universities describing the private groups. There are the emails showing that no openings available on the second floor are Kauffman, denying the other groups were collected. It's very difficult to find. How about like an email from the Dean of Student Services? I don't agree with the Young Conservatives Club, but I agree with this one, and therefore, we're going to pick this one. Anything like that? It's been the same nine groups. In 2011, it was a political process. The university was warned by the judge in the Curry case, the U.S. District Court judge, about concerns about viewpoint neutrality in light of Southworth. There was an internal document saying, hey, watch out for viewpoint discrimination. They made a political decision just to continue the same nine groups. My friend representing the university was asked, what's the neutral principle upon which the nine groups were chosen? We had a shifting answer, identities and cultures, and then to cover the Almadina group, you'd have to have a religion, right? Okay, so the neutral principle for the university is identities, cultures, religion, you choose. I thought a principle was supposed to apply to all nine groups. So when you're shifting back and forth, that's not a principle. It's not neutrality. So now at the university, a counselor, my friend, indicated that we were stereotyping, and I acknowledge the university as a government entity can say whatever it wants about me and my clients. The First Amendment doesn't protect me from that kind of speech, but when a university is using private speech in a limited public forum to advance a message, viewpoint neutrality applies. So do you think the Queer Cultural Center, the Feminist Activist Collective, Black Student Union, La Raza, and Almadina support that university message about no stereotyping? It does. Now just because my client isn't a stereotyper, we have no views, in a sense, on what these organizations are doing other than it's a violation of viewpoint discrimination. These student groups should be treated the same as other student groups because we pay university student fees. University student fees are paid and used for this limited public forum. Therefore, principles of Southworth apply, and this is egregious viewpoint discrimination. It's unreasonable, and the unbridled discretion of the university in this regard of limited public forum has been codified in policy. And so what we have is codified viewpoint discrimination, and the university says it's okay because we've been doing it for a long time. That even makes it more egregious.